ACCEPTED
03-14-00197-CV
5199863
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/7/2015 4:25:28 PM
JEFFREY D. KYLE
CLERK

## No. 03-14-00197-CV

_____

IN THE COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS AT AUSTIN

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/7/2015 4:25:28 PM
JEFFREY D. KYLE
Clerk

_____

## GRAPHIC PACKAGING CORPORATION,
*Appellant*

**v.**

## GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF TEXAS, AND KEN PAXTON, ATTORNEY GENERAL OF TEXAS,
*Appellees*

_____

**On Appeal from the 353rd Judicial District Court,
Travis County, Texas**
*Honorable Darlene Byrne, Presiding Judge*

_____

## BRIEF OF COUNCIL ON STATE TAXATION
## AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT

_____

David E. Cowling
State Bar No. 04932600
decowling@jonesday.com
Kirk R. Lyda
State Bar No. 24013072
klyda@jonesday.com
**JONES DAY**
2727 North Harwood Street
Dallas, Texas 75201-1515
(214) 220-3939
Fax: (214) 969-5100

Gregory A. Castanias
gcastanias@jonesday.com
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939
Fax: (202) 626-1700

Karl Frieden
kfrieden@cost.org
Frederick J. Nicely
fnicely@cost.org
**COUNCIL ON STATE TAXATION**
122 C Street, NW, Suite 330
Washington DC 20001-2109
(202) 484-5220
Fax: (202) 484-5229

**COUNSEL FOR *AMICUS CURIAE***

## ADOPTION OF PORTIONS OF APPELLANT'S BRIEF

Pursuant to Rule 9.7 of the Texas Rules of Appellate Procedure, *Amicus Curiae* adopts and incorporates by reference the identity of parties and counsel, the statement of the case, and the statement of facts set forth in Appellant's Brief.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

STATEMENT OF INTEREST OF AMICUS CURIAE ............................................ 1

INTRODUCTION ............................................................................................. 3

ISSUES PRESENTED ........................................................................................ 5

SUMMARY OF THE ARGUMENT ...................................................................... 7

ARGUMENT .................................................................................................... 9

I.  THE COMPACT APPLIES TO THE FRANCHISE TAX ............................ 9

    A.  The Compact defines "income tax" broadly ....................................... 10

    B.  The two apportionment provisions in the Texas statute can be reconciled .................................................................................... 15

II.  THE COMPACT IS BINDING AND SUPERSEDES CONFLICTING  STATE LAWS .................................................................. 18

    A.  Compacts are binding interstate agreements ..................................... 18

    B.  The Compact was considered binding when enacted ......................... 20

    C.  A binding compact was needed to forestall congressional intervention .................................................................................. 24

    D.  The election is the Compact's uniformity glue ................................. 29

CONCLUSION AND PRAYER .......................................................................... 31

CERTIFICATE OF COMPLIANCE .................................................................... 34

CERTIFICATE OF SERVICE ............................................................................ 35

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Alcorn v. Wolfe*, 827 F. Supp. 47 (D.D.C. 1993)......................................................19

*C.T. Hellmuth & Assocs., Inc. v. Washington Metro. Area Transit Auth.*, 414 F. Supp. 408 (D. Md. 1976) .........................................................19,20

*City of San Antonio v. City of Boerne*, 111 S.W.3d 22 (Tex. 2003)...................................................................................22

*Conley v. Daughters of the Republic*, 156 S.W. 197 (1913)........................................................................................15,16

*Doe v. Ward*, 124 F. Supp. 2d 900 (W.D. Pa. 2000)..............................................................18,19

*Gillette Co. v. Franchise Tax Bd.*, 147 Cal. Rptr. 3d 603 (Cal. Ct. App. 2012), *review granted,* 291 P.3d 327 (Cal. 2013) .......................................................................2,4,21,24

*Health Net, Inc. v. Oregon Dep't of Revenue*, No. TC 5127 (Oregon Tax Court Argued July 14, 2014)....................................2

*Hoechst Celanese Corp. v. Franchise Tax Bd.*, 22 P.3d 324 (2001)..................................................................................21

*International Bus. Mach. Corp. (IBM) v. Dep't of Treasury*, 852 N.W. 2d 865 (Mich. 2014).....................................................2,8,10,13,17,18

*Lorenzo Textile Mills, Inc. v. Bullock*, 566 S.W.2d 107 (Tex. Civ. App.—Austin 1978, no writ) ...............................15

*McComb v. Wambaugh*, 934 F.2d 474 (Pa. 1991).................................................................................19,20

*Miller v. Calvert,*
    418 S.W.2d 869 (Tex. Civ. App.—Austin 1967, no writ) ................................15

*Northwestern States Portland Cement Co. v. Minnesota,*
    358 U.S. 450 (1959)..................................................................3,26,27

*Robbins v. Shelby Cnty. Taxing Dist.,*
    120 U.S. 489 (1887)................................................................25

*Tex. State Bd. of Chiropractic Exam'rs v. Abbott,*
    391 S.W.3d 343 (Tex. App.—Austin 2013, no pet.)...........................................16

*Texas v. New Mexico,*
    482 U.S. 124 (1987)................................................................18

*U.S. Steel v. Multistate Tax Commission,*
    434 U.S. 452 (1978).............................................................2,20,23

*Virginia v. Tennessee,*
    148 U.S. 503 (1983)................................................................20

*Western Live Stock v. Bureau of Revenue,*
    303 U.S. 250 (1938)................................................................25

*Wintermann v. McDonald,*
    102 S.W.2d 167 (Tex. 1937) .......................................................15

**STATUTES**

15 U.S.C. §§ 381 *et seq.*.................................................................27

26 U.S.C. § 265 .........................................................................12

60 D.C. Reg. 12583-84 (Sept. 6, 2013) ................................................23

64th Leg., Gen. Sess. (N.D. 2015) ....................................................23

1974 Cal. Stat. 208 ....................................................................22

2013 Utah Laws 462 .....................................................................23

Act of May 17, 1967, 60th Leg., R.S., ch. 566, §1, 1967 Tex. Gen. Laws § 1254 ........................................................................................3

Act of May 2, 2006, 79th Leg., 3d. C.S., ch. 1, §§ 2-7, 2006 Tex. Gen. Laws 1 .........................................................................................9

Act of May 2, 2006, 79th Leg., 3d. C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 28 .........................................................................................9

Act of Sept. 14, 1959, Pub. L. No. 86-272, §103, 73 Stat. 555 .........................14,27

Assemb. No. 438, 61st Sess., 1981 Nev. Stat. 350 .......................................23

H.B. 1018, 67th Leg., 1st Reg. Sess. (W. Va. 1985) .....................................23

H.F. No. 677, 88th Leg., Reg. Sess. (Minn. 2013) ........................................23

H.P. 1024-L.D. 1462, 122nd Leg., 1st Spec. Sess. (Me. 2005) ........................23

H.R. 11798, 89th Cong., 1st Sess. (1965) ...................................................28

L.B. No. 344, 89th Leg., 1st Sess. (Neb. 1985) ...........................................23

Mich. Comp. Laws §§ 208.1101 *et seq*. .....................................................13

Public Law No. 86-272 ..........................................................................14,27

S.B. No. 1015, 2012 Leg. Reg. Sess. (Ca. 2012) ..........................................23

S.B. No. 156, 97th Leg. Reg. Sess. (Mich. 2014) .........................................23

S.B. No. 239, 2013 Leg. Assemb., 88th Sess. (S.D. 2013) .............................23

Tex. Gov't Code § 311.026(a) ...................................................................16

Tex. Gov't Code § 311.026(b) ...................................................................16

Tex. Tax Code § 141.001 ..........................................................................4

Tex. Tax Code § 141.001, art. II(4) .......................................................7,10,11

Tex. Tax Code § 141.001, art. III(1)................................................................5,10

Tex. Tax Code § 141.001, art. X(1)................................................................21,28

Tex. Tax Code § 141.001, art. X(2)...........................................................17,21,23

Tex. Tax Code § 171.006...................................................................................16

Tex. Tax Code § 171.101................................................................................7,12

Tex. Tax Code § 171.101(a)..............................................................................11

Tex. Tax Code § 171.106.............................................................................17,18

Tex. Tax Code § 171.106(a)...........................................................................5,30

Tex. Tax Code § 171.112(g).......................................................................9,13,16

Tex. Tax Code § 171.1011.............................................................................7,11

Tex. Tax Code § 171.1011(c)(2)(B) ..............................................................7,12

Tex. Tax Code § 171.1012.............................................................................7,11

Tex. Tax Code § 171.1013.............................................................................7,11

Tex. Tax Code § 171.1016(a) ...........................................................................12

Tex. Tax Code § 171.1016(c) ...........................................................................12

**RULES**

Tex. R. App. P. 9.4.............................................................................................34

Tex. R. App. P. 9.7..............................................................................................i

Tex. R. App. P. 11(c) ..........................................................................................1

**OTHER AUTHORITIES**

1A Norman J. Singer & J.D. Shambie Singer, Sutherland, *Statutes and Statutory Construction* § 32:5 (7th ed.) ...............................................18

Council On State Taxation, *COST Amicus Briefs* ........................................................2

Council of State Governments, *The Multistate Tax Compact, Summary and Analysis* (Jan. 20, 1967)........................................................3,21,31

Frank M. Keesling & John S. Warren, *California 's Uniform Division of Income for Tax Purposes Act, Part 1*, UCLA L. Rev. 156 (1967).................25

Jerome Hellerstein & Walter Hellerstein, *State Taxation* (3d ed. & Supp. 2014) ..............................................................................................25,27,29

John Dane, Jr., *A Solution to the Problem of State Taxation of Interstate Commerce*, 12 Vill. L. Rev. 507 (1967)......................................26,27

John S. Warren, *UDITPA—A Historical Perspective*, 38 State Tax Notes 133, (Oct. 3, 2005)...............................................................................25

Multistate Tax Commission, *Allocation and Apportionment Regulations*, (April 19, 2015) ...............................................................................11

Multistate Tax Commission, *First Annual Report* (1968)......................................28

Multistate Tax Commission, *Multistate Tax Commission 1968 Brochure on the Multistate Tax Compact, reprinted in* 66 Tax Notes 600, 600 (Nov. 19, 2012) ........................................................................28

Multistate Tax Commission, *Third Annual Report* (1970).....................................29

2 Richard D. Pomp, *State and Local Taxation* (7th ed. 2011) ...............................27

*Special Subcomm. on State Taxation of Interstate Commerce of the House Comm. on the Judiciary*, H.R. Rep. No. 89-565, vol. 3 (1965) ...............................................................................................................11

*Willis Committee Report* at 1135 (1965) ..............................................................27

**STATEMENT OF INTEREST OF *AMICUS CURIAE***

The Council On State Taxation ("COST") respectfully submits this Brief of *Amicus Curiae* in support of Appellant, Graphic Packaging, Inc. Pursuant to Rule 11(c) of the Texas Rules of Appellate Procedure, *Amicus Curiae* COST states that no persons other than COST or its counsel made any monetary contribution to the preparation or submission of this brief.

COST is a nonprofit trade association based in Washington, D.C. COST was organized in 1969 as an advisory committee to the Council of State Chambers of Commerce. COST's existence and history has always been closely intertwined with the Multistate Tax Compact ("Compact"), which was created two years prior to COST in 1967.

Today, COST has an independent membership of almost 600 of the largest multistate corporations engaged in interstate and international commerce, many of which do business in Texas. COST members represent that part of the nation's business sector that is most directly affected by state taxation of interstate and international business operations. Thus, COST is vitally interested in cases such as this one, which present issues significantly affecting the uniformity, certainty, and fair apportionment of state and local taxes.

COST's objective is to preserve and promote equitable and nondiscriminatory state and local taxation of multijurisdictional business entities, a

1

mission COST has steadfastly pursued since its creation. COST members employ a substantial number of Texas citizens, own extensive property in Texas, and conduct substantial business in Texas.

As *Amicus Curiae*, COST has participated in several significant United States Supreme Court cases over the past 40 years, including *U.S. Steel v. Multistate Tax Commission,* 434 U.S. 452 (1978). COST has also participated in filing *amicus curiae* briefs in litigation in other states related to the issue here— whether Compact member states' taxpayers may use the Compact's equally weighted three-factor apportionment election. *See Gillette Co. v. Franchise Tax Bd.,* 147 Cal. Rptr. 3d 603 (Cal. Ct. App. 2012), *review granted,* 291 P.3d 327 (Cal. 2013); *International Bus. Mach. Corp. (IBM) v. Dep't of Treasury*, 852 N.W. 2d 865 (Mich. 2014); and *Health Net, Inc. v. Oregon Dep't of Revenue*, No. TC 5127, (Oregon Tax Court Argued July 14, 2014).[1]

Counsel for *Amicus Curiae* and COST have determined it is important for *Amicus Curiae* to comment in this matter. Given COST's unique relationship and experience with the Compact, COST believes it brings an important perspective to this dispute. This *amicus curiae* brief sets forth a critical analysis for this Court to

---

[1] COST *amicus curiae* briefs are available online at: http://www.cost.org/StateTaxLibrary.aspx?id=3386.

better understand the role of the Compact in providing its member states' taxpayers with uniform corporate income tax apportionment rules.

**INTRODUCTION**

In *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450 (1959), the Supreme Court of the United States gave unprecedented latitude to the states to tax the income of out-of-state corporations on the basis of apportionment formulas that could vary state to state. Businesses quickly realized that if states used the authority of *Northwestern States Portland Cement Co.* to enact different apportionment formulas, businesses could face double taxation. Such differences also created significant compliance burdens.

Feeling pressure from Congress and multistate businesses, and attempting to avoid the straitjacket of congressionally imposed uniform rules for apportionment, a number of states banded together. Through the auspices of the Council of State Governments, those states drafted an interstate compact, the Multistate Tax Compact. *See* The Council of State Governments, *The Multistate Tax Compact, Summary and Analysis* (Jan. 20, 1967) (hereinafter "*Compact Analysis*"), *available at* http://www.pwc.com/us/en/State-local-tax/multistate-tax-compact/pdfs/csg_1967_Mtc_summary_and_analysis.pdf. Texas was one of the original adopters of the Compact in 1967, s*ee* Act of May 17, 1967, 60th Leg., R.S., ch. 566, § 1, 1967 Tex. Gen. Laws § 1254, 1254-65; and, as of today,

15 states and the District of Columbia remain signatories to the Compact. The Compact is codified in section 141.001 of the Texas Tax Code. The purpose of the Compact was to: (1) preserve state tax sovereignty by staving off federal legislation and (2) foster compatibility of state and local tax systems. *See, Compact Analysis*; *see also Gillette Co. v. Franchise Tax Bd.*, 147 Cal. Rptr. 3d 603 (Cal. Ct. App. 2012), *review granted*, 291 P.3d 327 (Cal. 2013). To accomplish this, the Compact allows each member state to retain the right to establish its own, default apportionment method; however multistate taxpayers would also have the right to elect to utilize the equally-weighted three factor Uniform Division of Income for Tax Purposes Act ("UDITPA") apportionment formula. *Id.* at 608-09. The states thus retain their sovereignty to adopt a default method, but some measure of interstate consistency is achieved through the alternative elective method.

At issue in this case is the provision of the Compact providing *taxpayers* with the option to use either a state's unique default apportionment formula or the Compact's uniform method of apportionment:

> *Any taxpayer* subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states *may elect to apportion and allocate his income* in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or *may elect to apportion and allocate in accordance with Article IV*.

4

Tex. Tax Code § 141.001, art. III(1) (emphasis added).

Based on this three-factor apportionment formula, Graphic Packaging filed timely refund claims for report years 2008 to 2010. The Comptroller denied Graphic Packaging's use of the Compact election. Graphic Packaging challenged this denial in district court, but the court ruled in favor of the Comptroller. In doing so, the court failed to adequately address the fundamental question: whether the State, having otherwise entered into a valid interstate compact, may *unilaterally* alter any of the terms of the Compact. Texas law makes it clear that the State has no such authority.

## ISSUES PRESENTED

The Texas Tax Code provides two methods for a multijurisdictional business to apportion income: (1) the default single-receipts factor method, contained in Chapter 171, and (2) the election method under the Compact, contained in Chapter 141.

Graphic Packaging followed the second method. This choice, and the State's response, gives rise to the following issues:

1. Does the Compact apply to the franchise tax under the Compact's broad terms of what constitutes an "income tax"?

2. By enacting Section 171.106(a), did the Texas Legislature implicitly repeal the Compact election?

5

3. Is the Compact binding on Texas, or may the State unilaterally withdraw from the Compact?

## SUMMARY OF THE ARGUMENT

This is a case of statutory construction of the Texas Tax Code, which provides two methods for a multijurisdictional business to apportion income: 1) the default single-receipts factor method, contained in Chapter 171; and 2) the election method under the Compact, contained in Chapter 141. For purposes of the Compact, the Texas franchise tax is an income tax subject to the three-factor apportionment election. As contained in Texas law, the Compact defines the term "income tax" broadly to include a tax that recognizes deductions not "specifically and directly related to particular transactions." Tex. Tax Code § 141.001, art. II(4). The franchise tax allows for such deductions, *see id.* §§ 171.101, 171.1011-.1013, and exclusions, *see id.* § 171.1011(c)(2)(B)).

Revision of the Texas franchise tax (also currently known as the margins tax) in 2006 did not repeal the Compact by implication. Texas courts strongly disfavor finding statutory repeal by implication. Accordingly, courts will attempt to harmonize allegedly conflicting statutes, and will find implied repeal only if harmonization is impossible. While Appellees argue that the Compact election under Chapter 141 cannot be squared with Chapter 171, these two apportionment methods are independent and reconcilable, not mutually exclusive.

Subject to two narrow exceptions not relevant here, Chapter 171 establishes the single-receipts factor as the default apportionment method for all Texas

franchise tax taxpayers. There are no alternative apportionment methods available under Chapter 171. Chapter 141, however, gives multistate taxpayers the option to elect out of the default method required by Chapter 171 and instead use the three-factor method in Chapter 141. This is exactly the kind of option envisioned by the Compact—the taxpayer may choose between the default method of Chapter 171, or the Compact election method of Chapter 141. There is no inconsistency, and, it plainly follows, no implied repeal of the Compact provisions. In reaching this conclusion, the Court has a ready model in a recent opinion from the Michigan Supreme Court. *See IBM v. Dep't of Treas.*, 852 N.W.2d 865 (2014).

The Michigan Supreme Court was grappling with whether the enactment of single-sales factor apportionment under its Business Tax Act ("BTA") repealed the Compact's election to utilize a three-factor apportionment method. *Id.* at 871. The Court stated that repeal by implication should be used in rare circumstances; the Michigan Legislature would have explicitly repealed the Compact if it no longer wanted the Compact to apply. *Id.* at 876-77. Since both Michigan and Texas require harmonization of potentially conflicting statutes, this Court should follow the Michigan Supreme Court's lead and find the Compact was not repealed by implication.

Even if the two statutory provisions are in irreconcilable conflict, the Compact itself is binding and supersedes any conflicting state laws. Interstate

8

compacts are both contracts and binding reciprocal state statutes among the member states, and therefore cannot be unilaterally modified. The Legislature allowed taxpayers to elect the certainty of the Compact's apportionment method. The subsequent enactment of a different default apportionment formula for non-electing taxpayers did not eviscerate the Compact's election. After adoption, the Texas Legislature must either adhere to the terms of the Compact or explicitly withdraw Texas from the Compact. Since the Legislature has yet to explicitly withdraw Texas from the Compact, it is still binding on Texas. And because it is still binding, taxpayers must be given the opportunity to elect to use the Compact's three-factor apportionment method for the State's franchise tax.

## ARGUMENT

## I. THE COMPACT APPLIES TO THE FRANCHISE TAX

Appellees question whether the Compact election is applicable to the franchise tax. Br. of Appellees at 20. But in May 2006, the Texas Legislature made the Compact applicable to the franchise tax. Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, §§ 2-7, 2006 Tex. Gen. Laws 1, 1-35. In doing so, the Texas Legislature deleted former section 171.112(g), which provided that "Chapter 141 does not apply to this chapter." *See id.* § 5, 2006 Tex. Gen. Laws 28. If this Court can reconcile two potentially conflicting provisions in the law relating to the Compact election and the State's separately enacted single-receipts factor formula,

9

then it need not reach the second issue of whether the Compact is binding on its member states (unless a state withdraws from the Compact itself). This was the approach taken by the Supreme Court of Michigan in the analogous case, *see IBM v. Dep't of Treas.*, 852 N.W.2d 865, 875-77 (Mich. 2014), holding that the rules of statutory construction required it to construe the two apportionment statutes together.

### A. The Compact defines "income tax" broadly.

The State's narrow reading of the term "income tax" is not supported by Chapter 141. The Compact election is applicable to "[a]ny taxpayer subject to an *income tax* whose income is subject to apportionment and allocation for tax purposes." Tex. Tax Code § 141.001, art. III(1) (emphasis added). The Compact defines "income tax" very broadly:

> [A] Tax imposed on or measured by net income including any tax *imposed on or measured by* an amount arrived at by deducting expenses from *gross income, one or more forms of which expenses are not specifically and directly related to particular transactions*.

*Id.* § 141.001, art. II(4) (emphasis added). The Compact goes on to define "gross receipts tax" more narrowly:

> [A] tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and *in the determination of which no deduction is allowed* which would constitute the tax an income tax.

*Id.* (emphasis added).[2]

The franchise tax is generally calculated as "total revenue" as determined for federal income tax purposes, less the deductible expenses allowed by the Texas Legislature. Referring to "total revenue" rather than "gross income" does not change the nature of the tax, as these types of terms were used interchangeably at the time the Compact was drafted. *See Special Subcomm. on State Taxation of Interstate Commerce of the House Comm. on the Judiciary*, H.R. Rep. No. 89-565, vol. 3, at 1014 (1965) (hereinafter the "Willis Committee Report," discussing the variety of equivalent state taxes imposed on "gross intake" whether labeled "gross proceeds," "gross income," or "gross receipts"). To be included within the Compact's definition of "income tax" therefore requires only that one or more expenses unrelated to specific transactions be permitted.

The franchise tax allows such deductions. A taxpayer's margin which is subject to tax in Texas is the lesser of four amounts: (1) 70% of total revenue; (2) total revenue less $1 million; (3) total revenue less cost of goods sold; or (4) total revenue less wages and compensation paid and costs of benefits provided (subject to a cap). Tex. Tax Code §§ 171.101(a), 171.1011-.1013. And taxpayers with total revenue of $10 million or less may use an E-Z computation that offers

---

[2] *See also* Multistate Tax Commission, *Allocation and Apportionment Regulations*, (April 19, 2015), http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Uniformity/ Uniformity_Projects/A_-_Z/Art%20II%20Regs%20(1968).pdf.

11

them the benefit of a lower tax rate, if they forego other credits and deductions. *Id.* § 171.1016(a), (c). Additionally, the franchise tax provides several exclusions from the determination of total revenue, among them, amounts deducted as bad debts for federal income tax purposes and foreign royalties and dividends. *Id.* § 171.1011(c)(2)(B).

The franchise tax cannot be a gross receipts tax as defined by the Compact because, while starting with total revenue, the franchise tax does not limit the scope of deductions to those that are "specifically and directly related to particular transactions." *See,* Tex. Tax Code § 171.101. In other words, the franchise tax deductions are not specifically and directly related to particular transactions. Thus, by the express terms of the Compact, the franchise tax constitutes an "income tax" for Compact purposes. Appellees' argument that a tax is not an income tax unless "*all* expenses and losses" (emphasis added) are allowed as deductions would transmute the federal income tax into something other than an income tax. Not all expenses and losses are deductible for federal income tax purposes. *See e.g.,* 26 U.S.C. § 265 (prohibiting a deduction for interest on a debt used to earn tax exempt income). The same holds true for the Texas franchise tax. Appellee's position is an inappropriate construction of the term "income tax."

This is also the same conclusion the Supreme Court of Michigan reached when looking at the gross receipts portion of Michigan's BTA.[3] The Michigan court noted: "Not only is the gross receipts amount reduced by numerous exclusions, it is also subject to a deduction for the 'amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts included in the modified gross receipts tax base.'" *IBM*, 852 N.W.2d at 664. Accordingly, the Michigan Supreme Court held that the BTA was an income tax and, therefore, a taxpayer could use the Compact election for both the net income tax and modified gross receipts portions of Michigan's BTA. *Id.* at 880-81.

Appellees' brief offers several arguments to support their position that the franchise tax is not an "income tax" within the meaning of the Compact. First, Appellees note that when the Legislature removed section 171.112(g)'s provision that the Compact does not apply to the franchise tax, the Legislature specified the franchise tax imposed by Chapter 171 is not an income tax. *See* Br. of Appellees at 14. In addition, Appellees note the Legislature expressly "signaled" the franchise tax does not fit within the Compact's "income tax" definition by stating that a federal law, Public Law No. 86-272, which prevents the states from imposing a tax on corporations in certain circumstances, does not apply to the

---

[3] The Michigan BTA, Mich. Comp. Laws §§ 208.1101 *et seq.*, imposed both a net income tax and a modified gross receipts tax. The tax has since been replaced with just a net income tax.

13

franchise tax. Br. of Appellees at 24; *see also* Act of Sept. 14, 1959, Pub. L. No. 86-272, § 103, 73 Stat. 555 (codified at 15 U.S.C. §§ 381-84). Appellees contend that the Legislature "could not have meant that the franchise tax simultaneously falls outside the scope of Public Law No. 86-272 but within the Compact's 'income tax' definition." *Id.* at 25.

*Amicus* addresses the Public Law No. 86-272 argument first. While the Texas Legislature can opine on whether the franchise tax is subject to that federal law, ultimately it is up to the courts to decide whether the franchise tax meets that definition. Section 103 of Public Law No. 86-272 merely defines "the term 'net income tax' [as] any tax imposed on, or measured by, net income." Act of Sept. 14, 1959, Pub. L. No. 86-272, § 103, 73 Stat. 555, 556 (codified at 15 U.S.C. § 383). The federal law does not afford state legislatures the discretion to impose their own limitations on how the federal law applies. Moreover, the applicability of Public Law No. 86-272 to the franchise tax is not before this Court, nor does the question of whether the Texas franchise tax qualifies as an "income tax" for purposes of Public Law No. 86-272 bear on whether the Texas franchise tax is an "income tax" within the meaning of the Compact.

Second, the Legislature's statement that the franchise tax is not an income tax does not impact what constitutes an "income tax" that term is used in Chapter 141; that Chapter contains the Compact's independent definition of what

14

constitutes an "income tax." Because that Chapter of the Texas Tax Code has its own, separate definition of an income tax, Appellees are making misguided arguments by stating Chapter 171's pronouncement that the franchise tax is not an income tax trumps another Chapter in the State's tax code. This case must be decided using the definition of "income tax" contained in Chapter 141, not any statements made in Chapter 171.

**B.    The two apportionment provisions in the Texas statute can be reconciled.**

Texas courts strongly disfavor repeal by implication. *Conley v. Daughters of the Republic*, 156 S.W. 197, 201 (1913). Thus, where two statutes are purported to be in conflict, Texas courts must reconcile them, if possible. *Wintermann v. McDonald*, 102 S.W.2d 167, 171 (Tex. 1937) ("In the absence of an express repeal by statute, where there is no positive repugnance between the provisions of the old and new statutes, the old and new statutes will each be construed so as to give effect, if possible, to both statutes.") (citation omitted). As this Court has noted, even if two statutes appear to be in conflict, the court has a "duty" to apply a construction that "harmonizes them and leaves both in concurrent operation, rather than destroy[ing] one of them." *Lorenzo Textile Mills, Inc. v. Bullock*, 566 S.W.2d 107, 110 (Tex. Civ. App.—Austin 1978, no writ) (quoting *Cole v. State*, 170 S.W. 1036, 1037 (1914); *see also Miller v. Calvert*, 418 S.W.2d 869, 872 (Tex. Civ. App.—Austin 1967, no writ).

15

This principle applies with particular force where, as here, the statutes are *in pari materia*—i.e., they share a common purpose or object. *Tex. State Bd. of Chiropractic Exam'rs v. Abbott*, 391 S.W.3d 343, 348-49 (Tex. App.—Austin 2013, no pet.). Codified as part of the Code Construction Act, the doctrine of *in pari materia* provides that where two statutes have a common purpose, they will be construed together. Tex. Gov't Code § 311.026(a). And even where a conflict between a general provision and a special provision is "irreconcilable," the special provision will be construed as an exception to the general provision, unless the general provision was enacted later and the Legislature intended it to govern. *Id.* § 311.026(b)*; Tex. State Bd. of Chiropractic Exam'rs*, 391 S.W.3d at 348 & n.2.

Here, the default apportionment method in Chapter 171 and the Compact election method have the same objective: to provide methods for a multijurisdictional business to apportion income. Because the Compact is an election, it does not conflict with the single-receipts factor apportionment provided for in Texas Tax Code section 171.006. And because the Compact has its own definition of when it applies to an income tax and former section 171.112(g) no longer applies, the Compact has not been repealed by implication (which is disfavored). *See Conley,* 156 S.W. at 201 (noting that when "[t]here is no express repeal of the former law . . . if repealed, it must be by implication, which is not

16

favored."). Indeed, the main premise behind the Compact was that there would be not only a default apportionment method under state law (like in Texas Tax Code Chapter 171) but also the elective method under the Compact. The fact that section 171.106 is the only apportionment method appearing in Chapter 171 does not conflict with certain taxpayers having an alternative, elective method in Chapter 141. Moreover, because the Compact is an interstate contract that contains an express provision allowing states to withdraw from the Compact "by enacting a statute repealing the same," Tex. Tax Code § 141.001, art. X(2), this Court should insist that only by the clearest, most unequivocal statutory action can a state break its obligations to other states and taxpayers. *See* discussion *infra* Part II.

The Supreme Court of Michigan faced a very similar issue in *IBM v. Department of Treasury*, 852 N.W.2d 865 (Mich. 2014). In *IBM*, the Michigan court had to interpret whether Michigan's enactment of a single-sales factor implicitly repealed the Compact's election language in the law. *Id.* at 868. While the Michigan Treasurer concluded that the two provisions could not be reconciled because they were diametrically opposed to each other, the Supreme Court of Michigan was able to harmonize the provisions. *Id.* at 877. The court held the Treasurer failed to overcome the presumption against repeal by implication. *Id.* The same analysis yields the same result here.

Based on Texas law and the consistent analysis in *IBM*, Tex. Tax Code § 171.106 did not impliedly repeal the Compact's three-factor apportionment election, and Appellant was entitled to use it to compute its Texas franchise tax liability.

## II. THE COMPACT IS BINDING AND SUPERSEDES CONFLICTING STATE LAWS

### A. Compacts are binding interstate agreements.

In this case, the taxpayer's right to avail itself of the "election" in the Compact is protected not only by a reconciliation of the relevant Texas statutes, but also by the express terms of the Compact itself. States create interstate compacts to address shared interests or problems occurring among or in multiple states. The unique characteristic of interstate compacts is that they contractually allocate collective state governing authority. They are at once contracts *and* binding reciprocal state statutes among the parties to the agreement:

> When adopted by a state, a compact is not only an agreement between that state and the other states that have adopted it, but becomes the law of those states as well, and must be interpreted as both contracts between states and statutes within those states.

1A Norman J. Singer & J.D. Shambie Singer, Sutherland*, Statutes and Statutory Construction* § 32:5 (7th ed.); *see also Texas v. New Mexico*, 482 U.S. 124, 128 (1987) ("There is nothing in the nature of compacts generally or of this Compact in particular that counsels against rectifying a failure to perform in the past as well as ordering future performance called for by the Compact."); *Doe v. Ward*, 124 F.

18

Supp. 2d 900, 914-15 (W.D. Pa. 2000) ("[I]nterstate compacts are the highest form of state statutory law, having precedence over conflicting state statutes. . . . Having entered into a contract, a participant state may not unilaterally change its terms.") (citations and internal quotation marks omitted).

> Upon entering into an interstate compact, a state effectively surrenders a portion of its sovereignty; the compact governs the relations of the parties with respect to the subject matter of the agreement and is superior to both prior and subsequent law. Further, when enacted, a compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties.

*C.T. Hellmuth & Assocs., Inc. v. Washington Metro. Area Transit Auth.*, 414 F. Supp. 408, 409 (D. Md. 1976).

Because compacts have this dual character — state statutes and reciprocal agreements with other states — the subject matter of these agreements "is superior to both prior and subsequent law." *Id.*; *see also McComb v. Wambaugh*, 934 F.2d 474, 479 (Pa. 1991) ("A Compact also takes precedence over statutory law in member states."); *Ward*, 124 F. Supp. 2d at 914-15 ("[I]nterstate compacts are the highest form of state statutory law, having precedence over conflicting state statutes.") (citation and internal quotation marks omitted); *Alcorn v. Wolfe*, 827 F. Supp. 47, 52-53 (D.D.C. 1993) ("[T]he terms of the [   ] compact cannot be modified unilaterally by state legislation to take precedence over conflicting state law.") (citations omitted). In other words, the decision of the Texas Legislature to

enter into the Compact effectively prohibits subsequent legislatures from enacting laws that unilaterally impair or alter those obligations piecemeal. *Hellmuth*, 414 F. Supp. at 409.

The Supreme Court of the United States has long maintained that not every agreement among the states requires congressional consent to qualify as a compact, be binding on member states, and obtain superior status to subsequently enacted conflicting state laws. *U.S. Steel*, 434 U.S. at 468-72. Nevertheless, "[e]ven without congressional consent, [h]aving entered into a contract, a participant state may not unilaterally change its terms. A Compact also takes precedence over statutory law in member states." *McComb*, 934 F.2d at 479; *see also Virginia v. Tennessee*, 148 U.S. 503, 519 (1983).

## B. The Compact was considered binding when enacted.

The analysis of the Compact by the Council of State Governments (the organization responsible for its drafting) makes clear the Compact's election was intended to be vested in taxpayers and *required* to be provided by the member states:

> The compact would permit any multistate taxpayer, at his option, to employ the Uniform Act for allocations and apportionments involving party states or their subdivisions. Each party state could retain its existing division of income provisions *but it would be required to make the Uniform Act available to any taxpayer wishing to use it.* Consequently, any taxpayer could obtain the benefits of multi-jurisdictional uniformity whenever he might want it.

Council of State Governments, *Compact Analysis*, at 1 (emphasis added).

The Compact's express terms also illustrate the intent of the drafters that the Compact would be a binding interstate agreement. By its terms, the Compact did not take effect until enacted and *entered into* by seven states. *See* Tex. Tax Code § 141.001, art. X(1). The Compact's specific provision for withdrawal requires party states to remain liable for outstanding contractual obligations. *Id.* § 141.001, art. X(2). If the Compact operated merely as a uniform state statute or model law, it would not need to provide for a method of withdrawal.

California's entry into the Compact is instructive. First, because California had already enacted the UDITPA as a model law, enacting the Compact's virtually identical UDITPA as an "an advisory compact containing model laws" as the Appellees argue, Br. of Appellees at 42, would have been a superfluous legislative act. *See Hoechst Celanese Corp. v. Franchise Tax Bd.*, 22 P.3d 324, 331 (2001) ("California's [UDITPA] mirrors the UDITPA."). Second, the California legislature took specific steps to shield the state from certain Compact requirements that would not have been necessary if the state did not view the Compact as binding. California entered the Compact in 1974, several years after the Compact became effective. *Gillette*, 147 Cal. Rptr. 3d at 608 (citing 1974 Cal. Stat. 193). The delay in California's enactment of the Compact was partially attributed to California objecting to two provisions of the Compact:

21

(1) Commission actions were approved by one vote per state, substantially diluting California's power in relation to its size; and (2) the Compact provided for the settlement of apportionment disputes by arbitration. To address California's concerns regarding the voting procedures, the by-laws of the Commission were amended to require, in addition to the one vote per state, a weighted vote by population. However, the arbitration clause could not be struck from the Compact without member states having to reenact the Compact, as the Compact includes no express provisions for amendment.

The solution was the enactment of uncodified statutory language *automatically withdrawing* California from the Compact should the arbitration clause be put into effect or the weighted voting procedure violated. 1974 Cal. Stat. 208. Thus, if California did not consider the arbitration clause of the Compact to be even potentially binding, the enacted automatic withdrawal provisions would serve no purpose. Likewise, the Texas Legislature is presumed to not engage in idle or superfluous acts. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) (citing *Spence v. Fenchler*, 180 S.W. 597, 601 (Tex. 1915) ("It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative.")).

22

As a binding agreement, the Compact has a very specific method for withdrawal. If a state determines it is no longer in its best interest to be a member of the Compact, the state must withdraw from the Compact "by enacting a statute repealing the same." Tex. Tax Code § 141.001, art. X(2). Several states have done this. *See U.S. Steel*, 434 U.S. at 454 (noting Florida, Illinois, Indiana, and Wyoming have withdrawn from the Compact). The following states have also withdrawn: California (S.B. No. 1015, 2012 Leg. Reg. Sess. (Ca. 2012); Nevada (Assemb. No. 438, 61st Sess., 1981 Nev. Stat. 350), Maine (H.P. 1024-L.D. 1462, 122nd Leg., 1st Spec. Sess. (Me. 2005)), Michigan (S.B. No. 156, 97th Leg. Reg. Sess. (Mich. 2014)); Minnesota (H.F. No. 677, 88th Leg., Reg. Sess. (Minn. 2013), Nebraska (L.B. No. 344, 89th Leg., 1st Sess. (Neb. 1985)), South Dakota (S.B. No. 239, 2013 Leg. Assemb., 88th Sess. (S.D. 2013)), and West Virginia (H.B. 1018, 67th Leg., 1st Reg. Sess. (W. Va. 1985)). Utah, North Dakota, and the District of Columbia have repealed elements of the Compact and then reenacted the Compact without the election. *See* 2013 Utah Laws 462; S.B. 2292, 64th Leg., Gen. Sess. (N.D. 2015); and 60 D.C. Reg. 12583-84 (Sept. 6, 2013). Texas, on the other hand, has not followed any of these approaches. It has ignored the very specific requirement in the Compact for "withdrawal"; instead it has merely enacted another apportionment provision different from the "election" provision in the Compact. The action by Texas in no way satisfies the terms of the Compact, and

23

thus does not relieve the State from following the Compact (including its election provision).

In a similar Compact case in California, *Gillette Co. v. Franchise Tax Board*, the California Court of Appeal ruled in favor of the taxpayer based on this line of reasoning. The Court held that California had not unilaterally withdrawn from the Compact as required by the terms of the Compact, and therefore the Compact, and its "election" provision were binding on the state. 147 Cal. Rptr. 3d at 616-17.

## C. A binding compact was needed to forestall congressional intervention.

The historical events leading up to the creation of the Compact confirm that a binding Compact was both contemplated by the participating states and necessary to effectuate the goals of the parties involved. The historical backdrop also underlines the critical importance of the Compact's election as the "glue" that held the Compact together.

The rapid growth of interstate and international commerce has presented a difficult problem for both the states and multistate taxpayers: how to devise an equitable and constitutional method for taxing corporations that do business in multiple states and countries.[4] While a consensus was building for the need for

---

[4] During the early years of our Nation's existence, the Supreme Court's view of the Commerce Clause of the U.S. Constitution was one which severely restricted state taxation of

24

uniformity among the states to avoid double taxation, the states were doing little to achieve that uniformity. As one commentator noted:

> Before 1957, the need for uniformity in state income taxation of multistate businesses was something like the weather—everybody talked about it, but nobody did anything about it. Then in that year, the Uniform Division of Income for Tax Purposes Act (UDITPA) was born.

John S. Warren, *UDITPA—A Historical Perspective*, 38 State Tax Notes 133 (Oct. 3, 2005).

Through the auspices of the National Conference of Commissioners on Uniform State Laws ("NCCUSL"), a model statute was drafted: UDITPA. UDITPA had two main objectives: "(1) to promote uniformity in allocation practices among the 38 states which impose taxes on or measured by the income of corporations, and (2) to relieve the pressure for congressional legislation in this field." Frank M. Keesling & John S. Warren, *California's Uniform Division of Income for Tax Purposes Act, Part 1*, 15 UCLA L. Rev. 156, 156 (1967).

UDITPA provided what was then the "gold standard" of apportionment formulas: the "three-factor" formula of equally weighting property, payroll and

---

interstate commerce. *See generally* Jerome Hellerstein & Walter Hellerstein, State Taxation ¶ 4 (3d ed. & Supp. 2014); *see also Robbins v. Shelby Cnty. Taxing Dist.*, 120 U.S. 489, 497 (1887) ("Interstate commerce cannot be taxed at all, even though the same amount of tax should be laid on domestic commerce, or that which is carried on solely within the state."). As the twentieth century unfolded, the Court began to waver from its steadfast prohibition. *See, e.g., Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 253-54 (1938). At the same time, the country began to experience a rapid expansion of multistate business enterprises, which coincided with the growing need for state revenues to finance public services and infrastructure.

sales. The policy rationale behind the three-factor apportionment formula is that equitable division of multistate business activity among states should be based on the three factors of production: property representing capital, payroll representing labor, and sales representing market.

Over the next decade, eleven states enacted corporate income tax statutes based on the UDITPA model statute—but most did so with substantial variations in the uniform terms.[5] The holding in *Northwestern Portland Cement Co.*, 358 U.S. 450 (1959), caused concern in the business community over possible double taxation of multijurisdictional businesses income.[6] In the wake of *Northwestern*

---

[5] While the states touted the uniformity provided by UDITPA, they were nevertheless free to enact whatever parts they thought beneficial or change them entirely. UDITPA, therefore, was "uniform in name only." John Dane, Jr., *A Solution to the Problem of State Taxation of Interstate Commerce*, 12 Vill. L. Rev. 507, 510 (1967).

> Eleven States have adopted what I, perhaps, technically erroneously described in my testimony as the "Uniform Division of Net Income for Tax Purposes Act. " I used the term "erroneously" advisedly, because 10 of the States which I had in mind have so substantially varied or changed the provisions in the uniform act that uniformity has been diluted, if not destroyed…Only one state, namely North Dakota, has really adopted the uniform act.

*Id.* at 511 (quoting a letter from Judge Morgan of the District of Columbia Tax Court to a member of the Special Subcommittee on State Taxation of Interstate Commerce of the Committee on the Judiciary, *see Hearings Before the Special Subcomm. On State Taxation of Interstate Commerce of the House Comm. on the Judiciary*, 89th Cong., 2d Sess. ser. 14 (1966)).

[6] Just after NCCUSL released the UDITPA model law, the Supreme Court, in *Northwestern Portland Cement*, 358 U.S. 450 (1959), for the first time explicitly held there was no Commerce Clause barrier to the imposition of a nondiscriminatory, *fairly apportioned* direct net income tax on an out-of-state corporation carrying on an exclusively interstate business within a taxing state. The case produced widespread alarm among businesses.

> There were predictions of the most dire consequences to business and, indeed, the entire nation. Two Senate Committees promptly held hearings, and there was vociferous demand for immediate congressional action. *Congress reacted with*

*Portland Cement Co.*, Congress enacted Public Law No. 86-272, which imposed some limits on how states could tax multistate businesses. Despite the enactment of Public Law No. 86-272, states feared that more federal legislation limiting states' taxing sovereignty would be forthcoming.

The states' fears were not unfounded, Congress formed the Willis Committee and gave that group a mandate to study state taxation of interstate commerce and make recommendations to *promote uniformity*. Among the conclusions of the Willis Committee was that the existing system of state taxation of interstate business was characterized by substantial inequities for interstate businesses. This was due to inconsistencies in state apportionment formulas and the different definitions of specific factors such a payroll, property, and sales. *See* John Dane, Jr., *A Solution to the Problem of State Taxation of Interstate Commerce*, 12 Vill. L. Rev. 507, 510-11 (1967). To solve this problem, the Willis Committee issued a report in 1965 calling for sweeping federal legislation that would have severely limited state authority to tax interstate business operations and imposed on the states a series of mandates, including a uniform apportionment regime. *See Willis Committee Report* at 1135 (1965); *see also* 2 Richard D. Pomp, *State and Local Taxation 11-14* (7th ed. 2011). The Willis Committee's

---

*astonishing speed and, for the first time in its history, adopted an act restricting the states' power to tax interstate businesses.*

Hellerstein & Hellerstein, State Taxation ¶ 6.17 (emphasis added). Congress immediately enacted Pub. L. 86-272 (codified at 15 U.S.C. §§ 381 *et seq.*)

recommendations were incorporated into H.R. 11798, entitled the Interstate Taxation Act, which was introduced in October 1965. H.R. 11798, 89th Cong., 1st Sess. (1965).[7]

> [A]fter examining the bill's provisions, state tax administrators had real cause for alarm. An immediate reaction was the calling of an unprecedented special meeting of the National Association of Tax Administrators for January 13 and 14, 1966, in Chicago. As stated by Mr. Bernard F. Nossel, then Secretary of NATA, ["]The task faced by the state representatives on January 13th was not merely to express opposition to H.R. 11798, but to oppose it in a constructive manner and to suggest workable alternatives which would eliminate the need for the kind of congressional action embodied in this bill.["] It was at this meeting that the idea of a *multistate tax compact* was envisioned.

Multistate Tax Commission, *First Annual Report* 1 (1968).[8]

The Compact was drafted by the states in 1966, presented to legislatures beginning in January 1967, and became effective under its terms, on August 4, 1967, when it was enacted into law by seven states. *See* Tex. Tax Code § 141.001, art. X(1) ("This compact shall enter into force when enacted into law by any seven states."). "The Compact is the state's answer to Federal control of state taxing policies and programs." Multistate Tax Commission, *Multistate Tax Commission*

---

[7] The bill utilized a uniform *two* factor formula (property and payroll) for the apportionment of income, leaving out the sales factor included in the UDITPA and most existing state apportionment formulae. The consequences for market states (those without large scale industry and manufacturing–payroll and property intensive activities) would have been financially devastating.

[8] This extensive analysis is available at http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual_Reports/FY67-68.pdf.

*1968 Brochure on the Multistate Tax Compact, reprinted in* 66 Tax Notes 600, 600 (Nov. 19, 2012).

**D.    The election is the Compact's uniformity glue.**

One of the major criticisms of state tax regimes by the Willis Committee Report was the lack of a uniform apportionment formula.  The Compact was in large part a reaction to that criticism.  Jerome Hellerstein & Walter Hellerstein, State Taxation ¶ 9.05, n.93 (3d ed. & Supp. 2014).

> Lack of uniformity among the business income tax statutes of the various states was the basis of a major business complaint to Congress.   The enactment of the Multistate Tax Compact has substantially increased that uniformity in that bodily incorporated into the Compact is the Uniform Division of Income for Tax Purposes Act (UDITPA).

Multistate Tax Commission, *Third Annual Report*, at 2 (1970), *available at* http://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Resources/Archives/Annual_Reports/FY69-70.pdf.

The Compact's election for UDITPA's three-factor apportionment formula was the uniformity glue that bound the states to a uniform apportionment rule.  The Commission's own words illustrate the intent:

> The Multistate Tax Compact makes UDITPA available to each taxpayer on an optional basis, *thereby preserving for him the substantial advantages with which lack of uniformity provides him in some states*.  Thus a corporation which is selling into a state in which it has little property or payroll will want to insist upon the use of the three-factor formula (sales, property, and payroll) which is included in UDITPA because that will substantially reduce his tax liability to that

state below what it would be if a single sales factor formula were applied to him; on the other hand, he will look with favor upon the application of the single sales factor formula to him by a state from which he is selling into other states, since that will reduce his tax liability to the state. *The Multistate Tax Compact thus preserves the right of the states to make such alternative formulas available to taxpayers even though it makes uniformity available to taxpayers where and when desired.*

*Id.* at 3 (emphasis added).

Consistent with the Compact's intent to preserve the right of states to make alternative formulas available to taxpayers, Texas adopted a single-receipts factor apportionment formula for apportioning income entirely on the proportion of receipts within Texas in relation to a company's receipts everywhere. Tex. Tax Code § 171.106(a).

The purpose of the Compact's vesting in taxpayers the option to elect UDITPA's "gold-standard" three-factor apportionment formula is thus brought into focus. Under the Compact, Texas is free to exercise its sovereignty and alter its apportionment formula in any manner it chooses (however inconsistent or incompatible it may be with those of other states)—a freedom that would not have existed under the proposed federal legislation the Compact was intended to stave off. However, the Compact requires taxpayers be vested with the option to choose UDITPA's reasonable, uniform three-factor apportionment formula, thus serving as a floor against the inconsistent apportionment formulas that were Congress'

*raison d'être* for threatening intervention into the state taxation of corporate income.

The analysis of the Compact submitted by the Council on State Governments promoting the adoption of the Compact further explains the role of the election and why the Compact was not merely "an advisory compact containing model laws," as the Appellees assert:

> Uniformity in State laws is generally considered to be a desirable objective, but a balance must be struck between a required uniformity and State and local independence. . . . States can achieve uniformity by individual and unilateral actions, provided that they enact the same statutes as all other States, keep them uniform after enactment, and administer them in the same ways. An attempt to achieve uniformity by such unilateral action is the [UDITPA]. . . . The Multistate Tax Compact provides that the Uniform Act will be available in all party States to any multistate taxpayer wishing to use it.

Council of State Governments, *Compact Analysis*, at 6.

The drafters of the Compact clearly intended its terms to be binding on the states entering into it. The Compact simply could not have achieved its primary purpose of forestalling congressional action but for it being binding, and but for taxpayers being given the option to choose the "gold standard" of uniform, fair apportionment, UDITPA.

## CONCLUSION AND PRAYER

The trial court erred when it granted the Comptroller's motion for summary judgment and denied Graphic Packaging's claim for refunds based on the

31

Compact's three-factor apportionment method. The Compact is still incorporated into Texas' tax law and can be reconciled with the State's franchise tax. Additionally, the Compact is a valid interstate compact, creating a binding agreement among the states party to it. Unless a state withdraws from the Compact, its terms take precedence over conflicting state statutes. Because Texas has not withdrawn from the Compact, it must adhere to its terms, including providing Graphic Packaging the election afforded taxpayers pursuant to Article III of the Compact.

For these reasons, *Amicus Curiae* COST respectfully prays that this Court reverse the judgment of the trial court and permit Appellant to elect to apportion the franchise tax according to the terms of the Compact.

Respectfully submitted,

**JONES DAY**
2727 North Harwood Street
Dallas, Texas 75201-1515
(214) 220-3939
Fax: (214) 969-5100

By  /s/ David E. Cowling
**David E. Cowling**
State Bar No. 04932600
decowling@jonesday.com

Karl Frieden
kfrieden@cost.org
Frederick J. Nicely
fnicely@cost.org
**COUNCIL ON STATE TAXATION**

Gregory A. Castanias
gcastanias@jonesday.com
Kirk R. Lyda
klyda@jonesday.com
**JONES DAY**

**COUNSEL FOR *AMICUS CURIAE*
COUNCIL ON STATE TAXATION**

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface requirements  Texas Rule of Appellate Procedure 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes.  This document also complies with the word-count limitations of Texas Rule of Appellate Procedure 9.4(e)(2)(B) because it contains 7,525rds, excluding the parts of the brief exempted by Rule 9.4(i)(1).

/s/ David E. Cowling
David E. Cowling

**CERTIFICATE OF SERVICE**

I certify that the foregoing Brief of *Amicus Curiae* was electronically filed with the Clerk of the Court using the electronic case filing system of the Court. I also certify that a true and correct copy of the foregoing was served via e-service or e-mail on the following counsel of record on May 7, 2015.

Amy L. Silverstein
asilverstein@sptaxlaw.com
**SILVERSTEIN & POMERANTZ LLP**
12 Gough Street, Second Floor
San Francisco, California 94103
Tele: (415) 593-3502
Fax: (415) 593-3501

James F. Martens
jmartens@textaxlaw.com
Amanda G. Taylor
ataylor@textaxlaw.com
Lacy L. Leonard
lleonard@textaxlaw.com
Danielle Ahlrich
dahlrich@textaxlaw.com
**MARTENS, TODD, LEONARD & TAYLOR**
301 Congress Avenue, Suite 1950
Austin, Texas 78701
Tele: (512) 542-9898
Fax: (512) 542-9899

**COUNSEL FOR APPELLANT**

Rance Craft
Assistant Solicitor General
rance.craft@texasattorneygeneral.gov
Cynthia A. Morales,
Assistant Attorney General
cynthia.morales@texasattorneygeneral.gov
**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tele: (512) 936-2872
Fax: (512) 474-2697

**COUNSEL FOR APPELLEES**

/s/ David E. Cowling
David E. Cowling